Alan J. WISKUP, on behalf of himself and all others similarly situated, Plaintiff,

v.

LIBERTY BUICK CO., INC., and U.B. Vehicle Leasing, Inc., Defendants.

No. 95 C 4885.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 8, 1997.

Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Tara Leigh Goodwin, Edelman & Combs, Chicago, IL, James Eric Vander Arend, Gessler, Hughes & Socol, Ltd., Chicago, IL, for Alan J. Wiskup.

Alan Norris Salpeter, Michele Odorizzi, Mayer, Brown & Platt, Chicago, IL, for Liberty Buick Co., Inc.

Alan Norris Salpeter, Michele Odorizzi, Victoria R. Collado, Mayer, Brown & Platt, Chicago, IL, for U.B. Vehicle Leasing, Inc.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Alan J. Wiskup has brought this action against Liberty Buick Company and U.B. Vehicle Leasing (UBVL) for their use of automobile lease forms that allegedly violate the disclosure requirements of the Consumer Leasing Act, 15 U.S.C. § 1667 et seq. (CLA), and several state statutes, and impose unreasonable termination charges in violation of federal and state law. Plaintiff further claims that UBVL has failed to pay interest on security deposits, in violation of the Illinois U.C.C. Defendants move to dismiss the entire complaint.[1] For the reasons stated below, we grant this motion in part and deny it in part.

---

1. The current motion to dismiss is the second one to come before us in this case. After Wiskup's original complaint was filed defendants moved to dismiss the first two counts, which alleged violations of the disclosure requirements of the Consumer Leasing Act, 15 U.S.C. § 1667 et seq. (CLA), and of the Illinois Consumer Fraud Act, 815 ILCS 505/10a (1995). We granted that motion in part and denied it in part. See Wiskup v. Liberty Buick Co., No. 95 C 4885, 1996 WL 18896 (N.D.Ill. Jan.17, 1996).

## FACTS

On April 30, 1994, Liberty Buick leased a 1994 Jeep Cherokee to Alan Wiskup for a four-year period.[2] Under the lease Wiskup was obligated to make 48 monthly payments of $387.62, for a total of $18,605.76. Wiskup also paid a $450 refundable security deposit at the inception of the lease. In addition to its payment terms the lease contained two provisions concerning early termination: one to cover voluntary terminations, and the other terminations by default. The first gave the lessee the right to voluntarily terminate the lease after the end of the first year, but obligated him to pay the lessor:

> A) the total of unpaid monthly rental payments remaining until the end of this Lease, minus (B) UBVL's unearned profit according to the accounting method called the sum of the months digits method, plus (C) the estimated residual value of the Vehicle (what it will be worth, if in good condition, at the end of the Lease term) calculated on the date of this Lease, minus (D) the sales price of the Vehicle, less repair, reconditioning and sale costs, plus (E) an early termination charge equal to 5% of the net amount in clauses (A), (B), and (C) above.

(Am.Compl.Ex.A (Vehicle Lease Agreement ¶ 19)).[3] The second provision gave the lessor the right to terminate the lease and take back the vehicle in the event of lessee's default. In this situation the lessee's payment obligations would be virtually identical to his obligations under the voluntary early termination provision, except that he would not have to pay the 5% early termination charge (Am. Compl. Ex. A (Vehicle Lease Agreement ¶ 28)).[4]

Approximately eleven months into the lease plaintiff had trouble making his lease payments and his wife contacted defendants to determine whether they could refinance the lease (Pl. Resp. to Defs. Mot. to Dismiss Am. Compl. App. D and E). Among other options, the Wiskups apparently considered buying out the lease and purchasing the vehicle (id. at 8, App.D at 47–48, App. E at 40). Seventeen months into the lease Wiskup returned the vehicle and the lease was terminated. The termination seems to have been carried out under the lease's default provision rather than its early voluntary termination provision, although this is not entirely clear from the pleadings.[5]

Plaintiff alleges that the lease violates the disclosure requirements of the CLA because it does not mention defendants' policy of retaining interest earned on security deposits, and because it does not sufficiently describe the unearned profit used to calculate rebates for early terminations and defaults (Count I).[6] He also claims that the lease imposes an unreasonable penalty for early termination, in violation of the CLA and state law, because it makes use of the "sum of the months digits" method in calculating rebates, and because it imposes a 5%

---

2. Liberty Buick then assigned its interest in the lease to UBVL. Liberty Buick remains an original lessor for the purposes of the CLA.

3. This provision also allows the lessee to obtain an independent appraisal of the vehicle's residual value. This part of the provision is not at issue in this case.

4. This provision also makes the lessee liable for any expenses the lessor incurs in retaking the vehicle, and for "(E) any other amounts the Lessee owes under this lease, minus (F) any other amounts required by law to be credited to the Lessee." These elements of the provision are not relevant to this case.

5. In his amended complaint, Wiskup asserts that "Plaintiff has returned the vehicle, resulting in an early termination of the lease" (¶ 12). This statement implies—but does not explicitly assert—that plaintiff underwent a voluntary early termination rather than a default. Defendants, on the other hand, have submitted an affidavit stating that the lease was terminated under its default provision. See Defs. Mem. in Supp. of their Mot. to Dismiss Am. Compl., Ex. 1. Plaintiff does not deny the assertions in the affidavit, but correctly argues that the affidavit is not properly before the court on a motion to dismiss (Pl. Resp. to Defs. Mot. to Dismiss. at 7–9). Because this factual issue remains ambiguous, we will resolve all doubts in favor of the plaintiff.

6. The complaint also alleges that the lease fails to disclose "[t]he charge for voluntary early termination in months 1–12" (¶ 26(b)(i)). Neither party seems to have briefed this issue. In any event, since plaintiffs did not terminate the lease until they were seventeen months into the lease term, they do not have standing to challenge this aspect of the lease.

early termination charge (Counts II and III). Next, plaintiff claims that defendants violated Illinois' Uniform Commercial Code, 810 ILCS 5/9–207, by retaining interest earned on security deposits (Count IV). Finally, plaintiff claims that defendants' retention of interest from security deposits, combined with their failure to disclose this retention in the lease, violates Illinois' Consumer Fraud Act, 815 ILCS 505/1 et seq., and Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. (Count V).

## DISCUSSION

Defendants have moved to dismiss Wiskup's entire complaint for failure to state a claim. Fed. R.Civ. P. 12(b)(6). We will not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); see also Gorski v. Troy, 929 F.2d 1183, 1186 (7th Cir.1991). In considering a motion to dismiss we must assume the truth of all well-pleaded factual allegations, and make all possible inferences in favor of the plaintiff. Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972); Vaden v. Village of Maywood, Illinois, 809 F.2d 361, 363 (7th Cir.), cert. denied, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987).

### 1. The Consumer Leasing Act

Plaintiff claims that defendants' lease violates the CLA in two ways. First, it violates the Act's disclosure requirements because it fails to define the term "unearned profit," and does not inform the consumer that the lessor retains the interest from security deposits. Second, the lease violates the Act's prohibition on unreasonable termination penalties, because it employs the "sum of the months digits" method (also called the "Rule of 78s") to calculate rebates, and charges a 5% penalty for early voluntary termination. We will first deal with the disclosure allegations, and then the unreasonable penalty claims.

### a. CLA Disclosure Requirements (Count I)

Wiskup claims that two elements of the lease violate the CLA's disclosure requirements. First, defendants retain interest earned from security deposits, but do not disclose this policy in the lease. The failure to mention this retention of interest, Wiskup argues, violates 15 U.S.C. §§ 1667a(4), (5), and possibly (8). Second, defendants fail to define the term unearned profit, in violation of 15 U.S.C. § 1667a(11). We will deal with each of these contentions in turn.

#### i. Interest from Security Deposits

Section 1667a(4) of the CLA requires the lessor to provide a statement of "[the] amount of other charges payable by the lessee not included in the periodic payments." Section 1667a(5) requires a statement of "the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term." Finally, section 1667a(8) requires a "description of any security interest held or to be retained by the lessor in connection with the lease and a clear identification of the property to which the security interest relates." Plaintiff argues that defendants' retention of interest amounts to a charge or a liability under these sections and that it must therefore be disclosed in the lease. Alternatively, he argues that both the security deposit and the interest earned from it are security interests under the CLA, and thus defendants' policy of retaining the interest must be disclosed.

Plaintiff cites two recent auto lease cases to support his argument, Werbosky v. Ford Motor Credit Co., 1996 WL 76133 (S.D.N.Y. 1996), and Demitropoulos v. Bank One Milwaukee, N.A., 924 F.Supp. 894 (N.D.Ill.1996). In Werbosky, the plaintiff alleged that Ford Motor Credit retained the interest earned from security deposits but did not inform the lessees that it would do so. The court first found that this policy violated New York Uniform Commercial Code § 9–207, which provides that a secured party who holds property as collateral must ultimately remit any profits obtained from that property to the debtor. Because Ford Motor Credit had a duty to return the interest to the lessee, its

**964**

retention of that interest amounted to a charge or liability that had to be disclosed under §§ 1667a(4) and (5) of the CLA. Similarly, the court in *Demitropoulos* first found that the defendant's policy of retaining interest from security deposits violated state law, and then found that this policy had to be disclosed as a charge or liability under the CLA. Furthermore, the *Demitropoulos* court found that the defendant had a security interest in the security deposits under § 1667a(8), and that interest earned on the security deposits was additional security that had to be disclosed. *Demitropoulos v. Bank One Milwaukee, N.A.,* 924 F.Supp. at 898.

■ Both *Werbosky* and *Demitropoulos* focus primarily on whether the relevant state law imposes a duty on lessors to remit interest from security deposits to lessees. Having found such a duty, both courts appear to conclude that its breach is self-evidently a charge or liability under the CLA. We decline to follow this approach. In determining whether defendants' retention of interest must be disclosed under the CLA, we will look to the text of the statute, its context and legislative history, and the implementing regulations issued by the Federal Reserve Board. *See Gaydos v. Huntington National Bank,* 941 F.Supp. 669, 672–674 (N.D.Ohio 1996). We will not look to state law, particularly given the fact that a general duty to remit interest from security deposits is not recognized in every state.[7] *See Parry v. Ford Motor Credit,* 575 F.Supp. 204, 206 (S.D.Ohio 1983) ("the violation of state law does not itself constitute a TILA violation unless TILA independently proscribes the activity").

■ Neither the CLA nor Regulation M explicitly requires disclosure of lessors' policy of retaining interest earned from security deposits. Nor does the language of the statute, considered more generally, appear to require such disclosure. Section 1667a(4) requires, in relevant part, that lessors disclose "the amount of other charges payable by the lessee not included in the periodic payments." On its face, this language does not

appear to cover interest retained from security deposits. Such interest is not "payable by the lessee to the lessor," 12 C.F.R. § 213.4(g)(5), in the ordinary meaning of that phrase. Rather, any interest earned on the security deposit is paid to the lessor by a third party, such as the bank in which the deposit has been placed. One can argue that in giving up the use of the security deposit for a year the lessee has also given the lessor the opportunity to earn interest on that money. Thus, the plaintiff has paid the lessor the time-value of the security deposit, an implicit charge that must be disclosed under the CLA. But this conclusion is not required by the language of the statute.

Similarly, the language of § 1667a(5), which requires disclosure of "the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term," does not self-evidently cover the interest earned from security deposits. Although, once again, one could argue that the loss of the time-value of the security deposit constitutes a liability under the CLA, this reading is not required. Indeed, where the statute and relevant regulations discuss specific end-of-term liabilities, they refer to additional sums owed to the lessor by the lessee, such as "the difference between the estimated value of the property and its realized value at ... the end of the lease term." 12 C.F.R. § 213.4(g)(13). Once again, the language of the statute does not on its face appear to apply to interest earned from security deposits.

■ Because the explicit language of the statute does not obviously cover plaintiff's claim, we must "consider the implicit character of the statutory scheme." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 560, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980). The CLA, 15 U.S.C. § 1667–1667e, was enacted in 1976 as an amendment to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"). The primary purpose of the TILA is to "assure a meaningful disclosure of credit terms so that the consumer will be

---

**7.** *See* section 3, *infra* (discussing the various positions states have taken regarding the remission of interest from security deposits).

able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a). By increasing the information available to consumers, the TILA is supposed to promote a more stable credit market, facilitate greater competition among creditors, and enhance consumers' ability to protect themselves from unfair practices. *Id.*

Congress enacted the CLA in 1976 because consumer leases, which were not subject to the disclosure requirements of the TILA, were increasingly being used as an alternative to credit purchases. Like the original TILA, the CLA's primary purpose is to require such disclosures as are necessary to "enable the lessee to compare more readily the various lease terms available to him," 15 U.S.C. § 1601(b). But because lease transactions are often used as alternatives to credit transactions, Congress also intended the CLA disclosure requirements to "enable comparison of lease terms with credit terms where appropriate." *Id.* For this reason Congress made the CLA part of the TILA, rather than an independent statute.

■ As plaintiff points out, courts construe the TILA and the CLA liberally, so that "even the most technical disclosure violations—whether or not they cause actual damage or deception—may trigger liability for the offending creditor." *Kedziora v. Citicorp Nat., Services, Inc.,* 780 F.Supp. 516, 519 (N.D.Ill.1991). But we will not "stretch these provisions beyond their obvious limits," *Ford Motor Credit Co. v. Millhollin,* 444 U.S. 555, 562, 100 S.Ct. 790, 795, 63 L.Ed.2d 22 (1980), to find a disclosure violation. Rather, we seek to balance " 'competing considerations of complete disclosure ... and the need to avoid ... [informational overload]' " *Id.* at 568, 100 S.Ct. at 798 (quoting S.Rep. 96–73, p. 3 (1979)) (brackets in original).

We find that disclosure of defendants' policy of retaining interest from security deposits would not further the purposes of CLA § 1667a(4) and (5). Both of those sections are intended to prevent the lessor from unfairly surprising the lessee by imposing extra charges or liabilities on him. It is difficult to

see how disclosure of this particular policy could further that goal. The CLA does not require lessors to put security deposits in interest-bearing accounts; nor does it dictate an appropriate rate of return. In fact, it imposes no substantive obligations in this area at all. Some lessors may put the money in a vault and earn nothing from it; others may put it in a bank and earn 5% interest; still others may invest it and receive a much higher return. Consumers cannot reasonably expect that when they sign a lease that does not promise the return of interest from security deposits they will nonetheless receive an additional sum of money when their deposit is returned.[8] Thus, they cannot be unfairly surprised when interest is not given to them at the end of the lease term. Lessors' retention of interest earned from security deposits is neither a charge nor a liability within the meaning of the CLA. *See Millhollin,* 444 U.S. at 561, 100 S.Ct. at 794–795 (defining the term "charge" under the TILA as a "specific assessable sum").

■ Finally, we find plaintiff's argument that both the security deposit and the interest earned from it are "security interests" requiring disclosure under § 1667(a)(8) to be uncompelling. The Federal Reserve Board has issued regulations governing the disclosure of security deposits under the CLA. First, 12 C.F.R. § 213.4(g)(2) requires the lessor to disclose the "total amount of any payment such as a refundable security deposit ... to be paid by the lessee at consummation of the lease." Second, 12 C.F.R. § 213.2(b)(2) holds: "A transaction shall be considered consummated at the time a contractual relationship is created between the lessor and lessee, irrespective of the time of performance of either party." In other words, the Federal Reserve Board has determined that the CLA disclosure requirements only pertain to the lessee's duties at the inception of the lease. This interpretation is consistent with the statute's purpose, noted above, of preventing the lessor from unfairly surprising the consumer with an extra

**8.** Unless state law imposes a duty on the lessor to remit such interest. But as we have noted above, the existence or nonexistence of such a state law duty is irrelevant to the disclosure requirements of the CLA.

charge—in this case, a security deposit—after the lease is signed. Expanding § 1667a(8) to include interest from security deposits would not further this purpose in any significant way. *See Gaydos v. Huntington National Bank,* 941 F.Supp. 669, 676–683. We dismiss Wiskup's claim that defendants' failure to disclose their policy regarding interest earned from security deposits violates the disclosure requirements of the CLA.

### ii. *Unearned Profit*

■ Plaintiff also argues that defendants' failure to explain the term "unearned profit" violates § 1667a(11) of the CLA, which requires the lessor to provide a statement of "the amount or method of determining any penalty or other charge for delinquency, default, late payments, or early termination." Defendants ask us to dismiss this claim. Although we denied defendants' initial motion to dismiss this claim, *see Wiskup v. Liberty Buick Co.,* 1996 WL 18896 at *4 (N.D.Ill. Jan.17, 1996), upon further reflection we have decided that dismissal is appropriate.

The Seventh Circuit has recently decided that lessors who merely name the method by which prepayment rebates are determined satisfy the requirements of § 1667a(11). *See Channell v. Citicorp National Services, Inc.,* 89 F.3d 379 (7th Cir.1996). In so holding, the court asserted that "[a] beneficial set of disclosure rules gives the consumer information that can be put to use, while withholding technical information that distracts from the rest of the disclosures.... Recitation of indigestible matters can make it hard for consumers to find what they really care about." *Id.* In other words, we should not require disclosures that will make the lease lengthier and more complex without significantly helping the consumer to "compare more readily the various lease terms available to him," 15 U.S.C. § 1601(b).

It is not easy to explain the meaning of the term "unearned profit" in a comprehensible and succinct manner. As we explain in section 1.b, *infra,* the profit or lease charge consists of the interest charged to the consumer to cover the implicit loan made at the outset of the lease, as well as various other necessary charges such as insurance fees. The unearned profit is that portion of the lease charge that is paid by the consumer before it comes due, and that must be returned to the consumer upon early termination of the lease. Thus, a full definition of the unearned lease charge would have to include a description of the implicit loan transaction, including the prepayment of interest required by the payment structure of the lease. *See* section 1.b, *infra.*

Much of this technical description could be avoided were we to require lessors simply to disclose the amount of the lease charge. Such a disclosure would enable the consumer to compare the cost of various leases and to determine the size of his expected rebate upon early termination. *See* 60 FR 48752 (September 20, 1995) (proposed rule requiring disclosure of lease charge); *see also Kedziora,* 780 F.Supp. at 520 (describing a lease which disclosed the amount of the lease charge). The consumer would similarly be helped by disclosure of the lease rate—that is, the annual percentage rate of interest charged on the implicit loan. But Regulation M does not require either of these disclosures. In fact, the Federal Reserve Board recently withdrew a proposed rule that would have required disclosure of the lease charge because it was more likely to mislead consumers than help them. *See* 61 FR 52246, 52255 (October 7, 1996). The Board has also refused to require disclosure of the lease rate, for similar reasons. *See id.; see also* 60 FR 48752, 48758 (September 20, 1995).

In the absence of such requirements, forcing lessors to provide an explanation of the term "unearned profit" would not advance the purposes of the CLA. All lessors rebate the unearned portion of the lease charge to the consumer. The size of the rebate will vary depending on the implicit lease rate and on the method the lessor uses to calculate the rebate. *See* section 1.b, *infra.* If lessors are not required to fully disclose these items, which vary from lease-to-lease, we see no purpose in requiring explanation of a term which does not so vary. Rather than aiding comparison of lease terms, such a requirement would needlessly contribute to informational overload. *Ford Motor Credit Co. v.*

*Millhollin,* 444 U.S. at 568, 100 S.Ct. at 798 (citations omitted).

We dismiss Count I of the amended complaint in its entirety.

### b. *Unreasonable Penalties under the CLA (Count I)*

Section 1667b(b) of the CLA states:

Penalties or other charges for delinquency, default, or early termination may be specified in the lease but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the delinquency, default or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasability of otherwise obtaining an adequate remedy.

Plaintiff claims that defendants' lease violates this provision in two ways. First, it imposes a 5% charge for voluntary early termination—a charge which, plaintiff claims, is not reasonably related to any costs the early termination imposes on the lessor. Second, defendants' use of the "sum of the months digits" method to determine the rebate of unearned profit upon early termination constitutes a penalty under the CLA because it is more favorable to the lessor than the actuarial method.

In their initial motion to dismiss defendants conceded that the reasonableness of the 5% early termination charge was a question of fact and thus did not seek to have this claim dismissed. In their second motion, however, defendants point to evidence indicating that the lease was terminated under its "Default" provision, and that the 5% charge was never imposed on the plaintiff. Therefore, defendants argue, plaintiff lacks standing to challenge the 5% prepayment penalty.

As plaintiff correctly argues, we cannot properly consider extrinsic evidence in deciding whether to dismiss a claim under Rule 12(b)(6). *In the Matter of Wade,* 969 F.2d 241, 249 (7th Cir.1992). For the purposes of this motion we must assume that the plaintiff was in some way harmed by the 5% charge, as he claims in his pleadings. Furthermore, we note that even if the 5% charge was never imposed on the plaintiff, this does not foreclose the possibility that plaintiff was harmed by the threat that the charge would be imposed. In short, the question of plaintiff's standing to challenge the 5% charge is a matter better resolved in a motion for summary judgment. Not enough evidence has been submitted for us to convert this motion to dismiss into a summary judgment motion. We decline to dismiss plaintiff's challenge of the 5% early termination charge.

Plaintiff also claims that defendants' use of the sum-of-the-months-digits method (also called "the Rule of 78s") to calculate his rebate of the unearned lease charge violates § 1667b(b). To understand plaintiff's claim one must examine both consumer leases and consumer credit purchases. These two types of transaction are highly similar, both functionally and structurally. Both are designed to enable consumers to obtain otherwise unaffordable goods, such as automobiles, by making a series of payments over a period of time rather than a single lump-sum payment. In a credit purchase, the creditor advances the purchaser a sum equalling the entire value of the merchandise at the time of purchase. The purchaser repays this sum over a given period of time, plus interest representing the time-value of the money loaned. Similarly, in a consumer lease the lessor advances the lessee a sum equalling the value of the merchandise at the inception of the lease, minus the estimated residual value of the merchandise at the end of the lease term. The lessee pays this sum back over the course of the lease, plus the lessor's profit or lease charge, which is directly analogous to the interest charged in a credit purchase. Thus, lease payments are calculated in precisely the same manner as credit purchase payments, except that the lessee only pays a portion of the value of the leased merchandise.

As the consumer pays off the principal owed on the lease or credit purchase, his interest obligations decrease as well. Thus, if he were to pay off the principal in equal installments, and pay off the interest as it was due, the consumer's monthly payments at the beginning of the transaction would be considerably higher than at the end. In order to avoid this, most leases and credit

purchase agreements include a pre-computed figure representing the consumer's total obligations under the contract, including both interest and principal. This figure is then divided by the number of months in the contract term, and the consumer makes a series of equal payments over the course of the term.

The underlying assumption of this payment system is that the consumer will spread out his payments over the whole contract term. Where the consumer instead goes into default or early termination, everything is recalculated to reflect the early return of the principal, and the consequent reduction in the interest (or lease charge) owed. Thus, for example, the default provision of Wiskup's lease first makes him liable for all of the payments remaining on the lease at the time of default, plus the estimated residual value of the automobile at the end of the lease term. Then it subtracts from his liability the sales price obtained for the vehicle and the unearned profit that has been charged to him. The net result should be that the lessee pays only for that portion of the principal that he has actually used, and that portion of the pre-computed lease charge (or interest) that has actually been earned. To the extent that he has been charged too much interest, he will receive a rebate.

██ In calculating Wiskup's rebate, defendants used the Rule of 78s rather than the actuarial method. The Rule of 78s has long been used as a shorthand method of determining the interest earned at any point in the term of a credit purchase. It is not as precise as the actuarial method, which uses a series of computations to determine the interest due for each payment period. *See Gantt v. Commonwealth Loan Company,* 573 F.2d 520, 524 n. 3 (8th Cir.1978) (explaining the operation of the actuarial method and the Rule of 78s). Still, it is widely used in the consumer credit industry because it allows the lender to determine the rebate in a single calculation and thus is more convenient than the actuarial method. *See id.*

In short-term loans, and in loans with a low annual percentage rate, the results obtained using the Rule of 78s are very close to those obtained under the actuarial method.

*See* James H. Hunt, *The Rule of 78: Hidden Penalty for Prepayment in Consumer Credit Transaction,* 55 B.U. L.Rev. 331, 338–349 (1975). But where the loan is long-term, and the annual percentage rate is higher, the differences between the two methods can be significant. *See id.* Moreover, to the extent that the Rule of 78s differs from the actuarial method, it favors the creditor. *See id.*

Wiskup claims that defendants' use of the Rule of 78s violates § 1667b(b) of the CLA. Because he would have received a larger rebate under the actuarial method than he actually received, he argues, he was penalized for early termination of the lease. Defendants move to dismiss this claim, making a three-pronged argument that the Rule of 78s, as a matter of law, is not a penalty under the CLA. First, defendants note, Congress has explicitly forbidden the use of the Rule of 78s in certain contexts, but not in the case of consumer leases. Courts should not create a general prohibition where Congress has chosen to treat the issue selectively. Second, the Federal Reserve Board has indicated that it does not consider the Rule of 78s a penalty under the TILA. 12 C.F.R. § 226.818(b) (1973). Courts should defer to the decisions of the Federal Reserve Board and interpret CLA terms consistently with identical terms in the TILA. Finally, defendants appear to argue that the CLA has left substantive regulation of rebate methods to the states and Illinois law permits the use of the Rule of 78s. If this method is permissible under state law, it should not be considered a penalty under the CLA.

██ We reject any argument that the term "penalty" under the CLA can be defined with reference to Illinois law. Defendants do cite several cases in which the court used state law to define a term under the TILA. *See, e.g., Steele v. Ford Motor Credit Co.,* 783 F.2d 1016 (11th Cir.1986) (using Georgia law to determine when interest is "unearned"). Such an approach is not an appropriate way to define the term "penalty" under the CLA, however. We do not believe that "Congress intended to 'build into the statute a morass of conflicting and uncertain state law.'" *Croysdale v. Franklin Savings Association,* 601 F.2d 1340, 1347 (7th Cir.

1979) (quoting *St. Germain v. Bank of Hawaii*, 573 F.2d 572, 575 (9th Cir.1977)). Given the wide variation among the states regarding the permissibility of the Rule of 78s, importing a state standard into the CLA would simply create confusion. Moreover, unlike most provisions in either the TILA or the CLA, § 1667b(b) is not a mere disclosure provision, but a substantive regulation of lease terms. *See Kedziora v. Citicorp National Services, Inc.*, 780 F.Supp. 516, 520 (N.D.Ill.1991) ("Section 1667b imposes substantive requirements of reasonableness on termination penalties and other charges, whereas Section 1667a imposes no substantive requirements on lease terms"). It would be inappropriate to import the substantive requirements for this statute from state law.

Defendants' other arguments are more convincing, however. In 1973 the Federal Reserve Board issued a regulation holding that the Rule of 788 was not a penalty under the TILA, requiring disclosure under 12 C.F.R. § 228(b)(6), but merely a method of computing the unearned finance charge which was to be disclosed under § 228(b)(7). More specifically, the Board found:

> Prepayment penalties which require disclosure under [§ 228(b)(6) ] ... occur when the obligor in such a transaction is required to pay separately an additional amount for paying all or part of the obligation before maturity.... Therefore, although in a precomputed obligation the finance charge rebate to a customer may be less when calculated according to the "Rule of 78s" or "sum of the digits" or other method than if calculated by the actuarial method, such difference does not constitute a penalty charge for prepayment that must be described pursuant to § 228(b)(6).

12 C.F.R. § 226.818(b)(1973). This interpretation remained in effect until 1981, when the Board's rescission of § 228(b)(7), which had required disclosure of the method of computing unearned finance charges, made it irrelevant. *See* 45 Fed.Reg. 29702, 29725 (May 5, 1980) (describing the TILA revisions). Following the Board's lead, several courts also found that the Rule of 78s was not a penalty under the TILA. *See, e.g., Bone v. Hibernia Bank*, 493 F.2d 135 (9th Cir.1974).

We must assume that Congress was aware, when it enacted the CLA, that neither the Board nor the courts considered the Rule of 78s to be a penalty under the TILA. Nonetheless, Congress used identical language in § 1667b(b), requiring that any penalty for default or early termination be reasonable. As we have noted above, the CLA is an amendment to the TILA, not an independent statute. The two are placed together because Congress wanted to "enable comparison of lease terms with credit terms where appropriate." 15 U.S.C. 1601(b). For this reason, we use TILA definitions and rules of construction, whenever possible, in interpreting the CLA. *See Demitropoulos v. Bank One Milwaukee, N.A.*, 915 F.Supp. 1399, 1406 (N.D.Ill.1996) ("Because the CLA is contained within TILA, the general rules of construction applicable to TILA apply to the CLA"); *Kedziora v. Citicorp National Services, Inc.*, 901 F.Supp. 1321, 1326 (N.D.Ill.1995) (holding that the damage provisions of the TILA, and cases interpreting them, are directly applicable to the CLA), *modified by Channell v. Citicorp National Services, Inc.* 89 F.3d 379 (7th Cir.1996); *Wiskup v. Liberty Buick*, No. 95 C 4885, 1996 WL 18896, at *2 (N.D.Ill. January 17, 1996) ("In interpreting the CLA, courts borrow TILA's definitions, damage provisions and general rules of construction"). Nothing in the text of the statute indicates that the term "penalty" under the CLA should be given a different meaning than it is given under the TILA. Nor does plaintiff's argument that "a loan is not a lease"[9] change our thinking. Although consumer credit purchases do differ in some ways from consumer leases, they are structurally very similar. The CLA is intended to highlight the similarities between leases and loans, so that consumers can make an intelligent choice between the two types of transaction. Varying the meaning of the term "penalty" would frustrate this goal.

Moreover, we recognize that Congress has delegated "expansive authority to

9. Pl. Resp. to Defs. Motion to Dismiss the Am. Compl. at 7.

the Federal Reserve Board to elaborate and expand the legal framework" surrounding the TILA. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559–560, 100 S.Ct. 790, 793–794, 63 L.Ed.2d 22 (1980). Thus, we "defer to the Federal Reserve Board and staff in determining what resolution ... is implied by the truth-in-lending enactments," *id.* at 560, 100 S.Ct. at 794, unless the Board's interpretation violates the clearly expressed meaning of the statute. Although the regulation explicitly holding that the Rule of 78s is not a penalty under the TILA was deleted from Regulation Z, the Board has never indicated a change of position on this issue. Rather, the regulation was deleted, as we have noted above, because a disclosure requirement on which it depended had been deleted. Because the Board has never defined the Rule of 78s as a penalty, creditors and lessors have continued to use it in calculating rebates upon default or prepayment. Although the necessity of using this method in the age of the computer is certainly open to question, *see Kedziora,* 780 F.Supp. at 525, we believe that the issue should be settled by means of a Board regulation and not as the result of a lawsuit. Lessors should not be held liable for employing a method of calculating rebates that has been considered acceptable until now.

■ This conclusion is further supported by the fact that Congress has recently addressed the use of the Rule of 78s under the TILA, and has chosen only to forbid it in "precomputed consumer credit transaction[s] of a term exceeding 61 months." 15 U.S.C. § 1615(b) (added to the TILA in 1993).[10] Congress has apparently determined that the Rule of 78s causes the most significant problems in credit purchases whose term is longer than five years, and has acted to forbid it in this context only. Since Congress has decided to treat this issue selectively, we will not second-guess it by adding a general prohibition of our own. If the Rule of 78s is to be forbidden, it must be done by Board regulation or statutory amendment.

**2. Unreasonable Penalties under Illinois Law (Count III)**

■ Plaintiff's next claim is that the 5% early termination charge and the use of the Rule of 78s violates state prohibitions on the imposition of unreasonable penalties. In particular, plaintiff argues that these policies violate 810 ILCS 5/2A–504(1), which requires that liquidated damages in lease contracts be "reasonable in light of the then anticipated harm caused by the default or other act or omission." Once again, defendants argue that plaintiff lacks standing to challenge the 5% charge, on the ground that it was not applied to them. Once again, we reject this argument and decline to dismiss this aspect of plaintiff's claim. *See* section 1.b, *supra.*

■ On the other hand, we grant defendants' motion to dismiss the Rule of 78s claim. Plaintiff points to no statutory prohibition on the use of the Rule of 78s in lease transactions. Instead, he argues that this method should be found to violate the UCC's general prohibition on unreasonable liquidated damages. We believe that such a finding would violate the express mandate of the Illinois Supreme Court, and would ignore the policies respecting this issue set forth by the Illinois legislature.

■ The Illinois Supreme Court has declared, in no uncertain terms, that the Rule of 78s should only be forbidden by an explicit statutory mandate: "[T]he decision to prohibit the use of the Rule of 78s in consumer credit transactions is not a matter for the courts, but rather involves policy decisions more properly addressed by the legislature. We decline, therefore, to restrict or prohibit the use of the Rule of 78s on public policy grounds." *Lanier v. Associates Finance, Inc.,* 114 Ill.2d 1, 18, 101 Ill.Dec. 852, 859, 499 N.E.2d 440, 447 (1986). The UCC's general prohibition on unreasonable liquidated damages cannot be interpreted to forbid the use of the Rule of 78s in lease transactions. If it were, then the Rule of 78s would also be forbidden in installment sales and in loans.

---

**10.** 15 U.S.C. § 1615(b) provides that "for any precomputed credit transaction of a term exceeding 61 months which is consummated after September 30, 1993, the creditor shall compute the refund based on a method which is at least as favorable to the consumer as the actuarial method."

■ 810 ILCS 5/2–718 (rules for liquidated damages in sales contracts) *Tomei v. Tomei and Affiliated Insurance Consultants, Inc.*, 235 Ill.App.3d 166, 172, 176 Ill.Dec. 716, 720, 602 N.E.2d 23, 27 (1992) (stating the common law rule: "For a liquidated damages provision to be held enforceable … the amount of fixed damages must be a reasonable forecast of the damage likely to occur"). But the Rule of 78s is mentioned with approval by several statutes covering installment sales and loans. *See, e.g.*, Retail Installment Sales Act, 815 ILCS 405/1 (requiring rebate at least as great as that computed under Rule of 78s); Motor Vehicle Installment Sales Act, 815 ILCS 375/7 (same); *see also* Consumer Installment Loan Act, 205 ILCS 670/16 (listing disclosure requirements when Rule of 78s is used).

■ Nor can it be argued that these statutes are specific grants of authority to use the Rule of 78s. The Retail Installment Sales Act and the Motor Vehicle Installment Sales Act are phrased as limitations on the permissible methods of calculating rebates, not as affirmative grants of authority.[11] Moreover, the Consumer Installment Loan Act, 205 ILCS 670/16(m), simply says that "if the licensee uses the 'Rule of 78ths' method," he must include a detailed statement explaining how the method works. This disclosure requirement cannot reasonably be read as an affirmative grant of authority. These statutes merely reflect Illinois' general policy of allowing the Rule of 78s.

Because the Illinois legislature has not chosen to forbid the Rule of 78s in lease transactions, we dismiss plaintiff's claim that defendants' use of this method of calculating rebates violates state law.

### 3. *Illinois Uniform Commercial Code (Count IV)*

Wiskup's next claim is that defendants' retention of interest earned from security deposits violates Illinois' Uniform Commercial Code ("UCC"), 810 ILCS 5/9–207(2), which provides:

> Unless otherwise agreed, when collateral is in the secured party's possession …
>
> (c) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation.

Plaintiff argues that this provision compels defendants either to remit to him any interest they have earned from his security deposit, or apply it against his obligation on the lease. Defendant counters that § 9–207 does not apply to security deposits. Rather, security deposits are regulated under the Illinois Consumer Deposit security Act of 1987 ("ICDSA"), 815 ILCS 165/3, which only requires lessors who have not posted a $10,000 bond with the Illinois Attorney General to segregate security deposits and remit the interest earned from them to the lessee.

■ The threshold question is whether security deposits on personal property come within the scope of Article 9 of the Illinois UCC. The Illinois courts do not appear to have considered this question, and so we will have to decide it as a matter of first impression.

By its own terms, Article 9 applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures," 810 ILCS 5/9–102(1)(a).[12] A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." 810 ILCS 5/1–201(37). Plaintiff argues that security deposits for automobile leases fall squarely within this definition: the lessor is given a possessory interest in the deposit during the lease term to ensure that

---

**11.** Both the Retail Installment Sales Act, 815 ILCS 405/7, and the Motor Vehicle Retail Installment Sales Act, 815 ILCS 375/7 say: "The amount of refund credit [in the event of prepayment] shall represent at least as great a proportion of the finance charge … as the sum of the periodical time balances under the schedule of installment payments in the contract."

**12.** 810 ILCS 5/9–104 lists a number of transactions excluded from Article 9. It has not been argued that security deposits come within any of these exclusions.

the lessee will make his lease payments and return the automobile in good condition.

Although this argument is strong, it runs up against several obstacles. The first of these is that no Illinois court, and very few courts nationwide, have found that a security deposit is a security interest within the meaning of the UCC. *See Purcell and Wardrope Chartered v. Hertz Corp.*, 175 Ill. App.3d 1069, 125 Ill.Dec. 585, 530 N.E.2d 994 (1988) (analyzing lease security deposits under Illinois leasing statute), *cert. denied* 125 Ill.2d 574, 130 Ill.Dec. 489, 537 N.E.2d 818 (1989). Moreover, the status of security deposits before the enactment of the UCC was, as one commentator has put it, "indefinite and confusing." Suzette Clover, *Interest on Security Deposits—Benefit or Burden to Tenant?*, 26 U.C.L.A. L.Rev. 396, 399 (1978). The majority of courts appeared to hold that the giving of a security deposit did not create a security interest, but a debt. *See, e.g., Donnelly v. Rosoff*, 164 Misc. 384, 386, 298 N.Y.S. 946, 948 (1937); *Handle v. Real Estate–Land Title & Trust Co.*, 316 Pa. 116, 173 A. 313 (1934). This meant that the lessor could commingle the deposit with his own funds and was under no obligation to pay interest to the lessee unless the contract specifically called for it. *See* Clover, *Interest on Security Deposits*, 26 U.C.L.A. L.Rev. at 399. Other courts, finding that the creditor-debtor model afforded insufficient protection to lessees, found that the giving of a security deposit created a pledge—the equivalent of a security interest under the UCC. *See, e.g., Boteler v. Koulouris*, 1 Cal.App.2d 566, 37 P.2d 136 (2d Dist.1934); *Colantuoni v. Balene*, 95 N.J.Eq. 748, 123 A. 541 (1924). Under this model, the lessor was still allowed to commingle the deposit, but was prohibited from disposing of the deposit or doing anything to jeopardize its return to the lessee. *See* Clover, *supra* at 400–401. Moreover, if the lessor earned interest from the deposit, he was required to remit this to the lessee. *Id.* Finally, it was sometimes argued that the

giving of a security deposit created a trust, and that the lessor had a positive duty to invest the deposit for the benefit of the lessee.[13] Once again, the lessor had to remit all profits to the lessee at the end of the lease term. *Id.*

In 1921, long before the genesis of the UCC, Illinois enacted a statute to resolve the confusion surrounding security deposits in leases of personal property. See Ill.Rev. Stat.1985, ch.29, pars. 9–14.[14] This statute stated that in all contracts for the rental of personal property, any money advanced as a security deposit "shall be deposited at interest with a bank, trust company or savings and loan association ... in trust for the use of the parties to such contract or agreement." *Id.* at par. 9. The statute further required that "[a]ny interest which accrues while the money advanced is so deposited shall be kept with the principal sum and shall be disposed of in the same manner as the principal sum in accordance with the provisions of this act." In short, the Illinois legislature chose to treat the security deposit as a kind of quasi-trust, under which the lessor has a positive duty to segregate the lessee's funds from his own, and to earn interest on them for the lessee's benefit.

The enactment of the UCC in Illinois had no discernible effect on the lessor's duties concerning the lessee's security deposit. The one reported case dealing with this issue analyzed it under the preexisting statute, and made no mention of the UCC. *Purcell and Wardrope Chartered v. Hertz Corp.*, 175 Ill. App.3d 1069, 125 Ill.Dec. 585, 530 N.E.2d 994 (1988). The failure to mention the UCC was not accidental. The security deposit statute imposed different, and higher, duties on the lessor than the UCC. Unlike the UCC, it required lessors to segregate security deposits from their other funds, and imposed a positive duty on them to invest these funds at a profit. This quasi-trust relationship, with

---

**13.** This argument did not have much success in the courts, partially because the lessor and lessee have a conflict of interest regarding the disposition of the security deposit, making a traditional trust relationship impossible. However, many states created a quasi-trust relationship between lessor and lessee by statute. *See* Suzette Clover, *Interest on Security Deposits—Benefit or Burden to Tenant?*, 26 U.C.L.A. L.Rev. at 401–406.

**14.** This statute was repealed in 1987 and replaced by the Consumer Deposit Security Act of 1987, 815 ILCS 165/1–5.

its corresponding rights and duties, was different in kind from the relationship between a secured party and a debtor, and was not implicated at all by the passage of 810 ILCS 5/9–207(2).

In 1987 the Illinois legislature repealed the old security deposit statute and enacted the Consumer Deposit Security Act, 815 ILCS 165/1–5, in its place. Under the new Act lessors no longer have a duty to segregate security deposits and invest them at a profit. Rather, they now have the option either to post a $10,000 bond with the Illinois Attorney General to ensure the refund of the deposits, or to place the deposits in an account with a bank, trust company or savings and loan. This account does not have to be interest bearing but, if it is, the lessor must remit all interest earned to the lessees. 815 ILCS 165/3.

Plaintiff argues that the Consumer Deposit Security Act merely concerns itself with the return of security deposits, and only mentions interest as an incidental matter. The lessor's basic duty concerning interest earned from security deposits is still governed by the UCC. This argument is rather thin. Both UCC 9–207 and the Consumer Deposit Security Act are concerned with exactly the same issue: making sure that the party who gives property as security will receive it back after fulfilling his obligations. The Consumer Deposit Security Act lays down specific rules for accomplishing this purpose in personal property leases involving security deposits. Moreover, the Act appears to be no less rigorous than the UCC in its requirements. We do not believe that the Illinois courts would confuse the issue by applying both the UCC and the Consumer Deposit Security Act to security deposits in automobile leases. Nor will we. We dismiss plaintiff's claim that defendants' policy of retaining interest from security deposits violates 810 ILCS 5/9–207(2).[15]

### 4. *Deceptive Trade Practices (Count V)*

 Finally, plaintiff argues that defendants' undisclosed policy of retaining interest from security deposits violates Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("Consumer Fraud Act") and its Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* ("Uniform Act"). As we noted when considering defendants' first motion to dismiss, compliance with the CLA is a defense to claims under the Consumer Fraud Act. *See Wiskup v. Liberty Buick Co.,* No. 95 C 4885, 1996 WL 18896 at *5 (N.D.Ill.1996); *see also Lanier v. Associates Finance, Inc.,* 114 Ill.2d 1, 101 Ill.Dec. 852, 859, 499 N.E.2d 440, 447 (1986); *Wislow v. Wong,* 713 F.Supp. 1103, 1107 (N.D.Ill.1989). Defendants' policy regarding interest earned from security deposits does not violate the CLA (*see* discussion *supra*); thus, we find that it is also permissible under the Consumer Fraud Act. We further find defendants' policy to be permissible under the Uniform Act. Section 2 of the Consumer Fraud Act incorporates the standards of the Uniform Act, so that any violation of the latter is also a violation of the former. 815 ILCS 505/2.[16] If a business practice complies with the Consumer Fraud Act, it must also comply with the Uniform Act, *a fortiori.* We find that compliance with the CLA is a defense to the Uniform Act as well as the Consumer Fraud Act. Accordingly, Count V of the amended complaint is dismissed in its entirety.

### *CONCLUSION*

Defendants' motion to dismiss is granted as to Count I; granted in part and denied in part as to Counts II and III; granted as to Count IV; and granted as to Count V.

---

15. This does not mean that defendants are precluded from showing a violation of the Consumer Deposit Security Act, 815 ILCS 165/1–5. Should they wish to amend their complaint to include a claim under this Act, we will consider it at that time.

16. 815 ILCS 505/2 states, in relevant part, that "the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' ... [is] hereby declared unlawful."