**PERSONAL FINANCIAL SERVICES, INC. and Robert Lanna, Plaintiffs,**

v.

**GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant.**

No. 3:96CV00275(AWT).

United States District Court, D. Connecticut.

Sept. 28, 2001.

Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Louise T. Walsh, Edelman, Combs & Latturner, Chicago, IL, Matthew Richard Cerick, New Canaan, CT, for Plaintiffs.

Steven M. Greenspan, Gary Mann Becker, J. Michael Amrein, Day, Berry & Howard, Hartford, CT, for Defendant.

### RULING ON MOTION TO DISMISS

THOMPSON, District Judge.

The plaintiffs, Personal Financial Services, Inc. ("PFS") and Robert Lanna, ("Lanna") bring this suit individually, and on behalf of all others similarly situated, against defendant General Motors Acceptance Corporation ("GMAC"). The plaintiffs allege, *inter alia*, that the defendant's failure to notify lessors of the profits it derived from the security deposits for its automobile leases, and to pass those profits on to the lessors, violates Section 9–207(2)(c) of the Uniform Commercial Code, (the "UCC") as codified in Conn. Gen.Stat. § 42a–9–207(2)(c), and the Connecticut Unfair Trade Practices Act ("CUTPA"). Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defendant has moved to dismiss Counts I and II of the Fourth Amended Class Action Complaint. For the reasons stated below, the motion is being granted.

### I. BACKGROUND

The relevant facts for the purposes of this motion are as follows. Plaintiff PFS is a Connecticut corporation. Plaintiff Lanna is the President of PFS and a Connecticut resident. Defendant GMAC, which is part of a corporate group headed by General Motors Corporation, is a New York corporation which does business in Connecticut.

On November 30, 1992, PFS and Lanna entered into a four-year automobile lease agreement (the "Lease") with GMAC. In accordance with the lease agreement, the plaintiffs paid a security deposit of $600.00 to GMAC at the outset of the Lease.

With respect to the security deposit, the Lease provides:

A refundable security deposit is part of the payment you make when you sign this Lease. Lessor will deduct from the

security deposit any amounts you owe under this Lease and do not pay. After the end of the Lease, Lessor will refund to you any part of the security deposit that is left.

Lease, ¶ 30. The plaintiffs contend that although GMAC earns no interest on the security deposits for any of its leases, it, nevertheless, "derives a financial benefit or other profits from the bank(s) in which the security deposits are placed." Compl. ¶ 23. According to the plaintiffs, the financial benefit or other profits earned by GMAC on the security deposits are "retained by GMAC and is [sic] not credited to the lessee in any manner." Compl. ¶ 24.

Based on these allegations, the plaintiffs assert four claims, which include claims for violation of (1) Section 9–207(2)(c) of the UCC, as codified in Conn. Gen.Stat. § 42a–9–207(2)(c), and (2) CUTPA. In Count I of the complaint, the plaintiffs seek "restitution for the benefit which accrued to GMAC on plaintiffs' and class members' security deposits, but which was not returned to them at the end of the lease." Compl. ¶ 2. In Count II, the plaintiffs allege that GMAC violated CUTPA by its "failure to disclose the fact that GMAC derived a benefit or earned other profits from the lessees' security deposits and retained such amounts." Compl. ¶ 44.

GMAC has moved to dismiss each of these counts on the grounds that it fails to state a claim.

## II. *LEGAL STANDARD*

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Stores Co.*, 34 F.Supp.2d 130, 131 (D.Conn. 1999), quoting *Ryder Energy Distrib. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir.1984). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*, 727 F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer*, 416 U.S. at 232, 94 S.Ct. 1683).

## III. *DISCUSSION*

### A. Count I: Section 9–207(2)(c)

GMAC argues that Count I should be dismissed for failure to state a claim because § 9–207(2)(c) of the UCC does not apply to automobile lease security deposits. Conn. Gen.Stat. § 42a–9–207 provides, in relevant part:

(2) Unless otherwise agreed, when collateral is in the secured party's possession ... (c) the secured party may hold as additional security any increase or profits, except money, received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation[.]

Collateral is defined as "the property subject to a security interest." Conn. Gen. Stat. § 42a–9–105(1)(c).

GMAC contends that it has no "security interest" in the money it collected from the plaintiffs as a security deposit for the

leased automobile. A security interest is defined as "an interest in personal property ... which secures payment or performance of an obligation." Conn. Gen.Stat. § 42a–1–201(37). The plaintiffs argue that the security deposit constitutes "personal property", and that the purpose of the security deposit is plainly to "secure payment or performance" of the lessee's obligations under the Lease.

There do not appear to be any reported decisions of Connecticut courts addressing the applicability of Article 9 to security deposits under automobile leases. A number of courts in other jurisdictions have addressed the issue recently. Only one appears to have found that the collection of a security deposit on an automobile lease gives rise to a "security agreement" as defined in the UCC. See *Demitropoulos v. Bank One Milwaukee, N.A.*, 924 F.Supp. 894 (N.D.Ill.1996) (*Demitropoulos I* ), later opinion, 953 F.Supp. 974 (N.D.Ill.1997) (*Demitropoulos II* ) (holding that the defendant's lease form created a security interest in the plaintiff's cash deposit, and that UCC 9–207 therefore applied).

However, most courts that have considered the issue have found that the UCC does not apply to security deposits retained in connection with automobile leases. *See, e.g., Rosen v. Primus Automotive Fin. Servs., Inc.*, 618 N.W.2d 606, 607 (Minn.Ct.App.2000) (holding that "an automobile dealer's receipt of a security deposit in a commercial leasing transaction creates a debtor-creditor relationship" between the parties and UCC § 9–207 does not apply); *Dolan v. General Motors Acceptance Corp.*, 137 Ohio App.3d 668, 672, 739 N.E.2d 848 (Ohio Ct.App.2000) (holding that "a security deposit does not create a security interest"); *Yeager v. GMAC*, 719 So.2d 210, 213 (Ala.1998) (holding that if no intent to create a security interest in a security deposit under an automobile lease is "specifically expressed in the agreement, then no security interest is created"); *Werbowsky v. Ford Motor Credit Co.*, No. Civ. 1876(JSM), 1998 WL 159051 (S.D.N.Y. April 1, 1998) ("UCC § 9–207 does not apply to [automobile] lease deposits"); *Wiskup v. Liberty Buick Co.*, 953 F.Supp. 958, 973 (N.D.Ill.1997); *Steinmetz v. Toyota Motor Credit Corp.*, 963 F.Supp. 1294, 1304 (E.D.N.Y.1997).

Two factors are significant in analyzing whether the security deposit made by the plaintiffs under the Lease, which is governed by Connecticut law, comes within the scope of the UCC: the state statutory framework, and the language employed in the Lease itself. Consideration of each of these factors supports the conclusion that the security deposit at issue here is not subject to the UCC.

### i. Connecticut Statutes

Unlike some states, Connecticut has enacted no statute dealing specifically with automobile leases. Therefore, there is no question in this case of whether a more specific law ought to trump the general provisions of the UCC, as was true in cases brought under New York and Illinois law. *See, e.g., Wiskup*, 953 F.Supp. 958; *Steinmetz*, 963 F.Supp. 1294. However, Connecticut has enacted numerous statutes addressing the treatment of security deposits in other situations, and in particular the matter of interest to be paid on security deposits. *See, e.g.,* Conn. Gen. Stat. § 47a–22a (requiring the state to return security deposits paid by residents of senior citizen public housing with interest of 5¼% per annum); Conn. Gen.Stat. § 19a–551 (requiring nursing homes to pay interest of 5½% on any security deposit made by a patient); Conn. Gen.Stat. § 16–262j(c) (requiring utility companies to pay interest on security deposits at a variable

rate determined by a set formula); Conn. Gen.Stat. § 47a–21(i) (requiring residential landlords to pay interest on security deposits made by tenants at a variable rate determined by a set formula). Clearly, the Connecticut state legislature knows how to enact laws requiring payment of interest on security deposits; yet it has chosen not to enact any such law with respect to security deposits made in connection with automobile leases.

■ "Absent more specific legislative regulation, and given the weight of common law and scholarly comment, a lessee maintains only an expectation that his security deposit is a debt that will be repaid." *State v. Larson*, 605 N.W.2d 706, 712 (Minn.2000). Although there do not appear to be any Connecticut decisions addressing the treatment of security deposits at common law, New York precedent also indicates that at common law security deposits on leases were not construed to create a security interest on the part of the lessor in the deposit. *See, e.g., Mendelson–Silverman, Inc. v. Malco Trading Corp.*, 146 Misc. 215, 260 N.Y.S. 881 (1932); *Levinson v. Shapiro*, 238 A.D. 158, 263 N.Y.S. 585 (1933) (holding that a security deposit is in essence a "loan by the lessee to the lessor, to be returned to the latter, either by applying the amount so deposited on the rent … [or in] satisfaction of claims for damages from breaches of other covenants … or by repaying, at the end of the term, the amount deposited").

### ii. The Lease Language

Since there is no state statute directly applicable, the court looks to the plain language of the lease agreement. Three points are significant in evaluating this language.

■ First, there is the question of the intent of the parties. In order to create a security agreement that is governed by Article 9 of the UCC, the parties must, as the term suggests, *agree* to do so. *See* Conn. Gen.Stat. § 42a–9–102 ("this article applies … to any transaction … which is intended to create a security interest in personal property"); UCC § 9–102, Comment 1 ("the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?"). Here there is no indication in the language of the Lease of any intention to enter into a security agreement.

Second, there is the question of whether the Lease provision governing the security deposit concerns a "pledge"—in which case the UCC would apply—or a "payment". Article 9 covers "security interests created by contract including *pledge*." Conn. Gen. Stat. § 42a–9–102(2). A pledge is a "bailment or other deposit of personal property to a creditor as security for a debt or obligation." Black's Law Dictionary, 1175 (7th ed.1999). A "payment", on the other hand, is the "performance of an obligation, usually by the delivery of money." Black's Law Dictionary, 1150 (7th ed.1999).

The plain language of the Lease provides that the "security deposit is part of the *payment* you make" at the inception of the Lease. Compl. Ex. A, ¶ 30 (emphasis added). This security deposit can accurately be described, then, as an "advance payment", which is defined by Black's as "payment made in anticipation of a contingent or fixed future liability or obligation." Black's Law Dictionary, 1150 (7th ed.1999). In this case, the payment—called a security deposit—is made in anticipation of the contingent liability that would arise should the lessee fail to pay an amount it owes under the Lease. If the liability never materializes, the prepayment will be returned to the lessee. This plain language approach is in accord with "the common-law principle that a security deposit cre-

ates only a debt." *Dolan*, at 672, 739 N.E.2d 848.

Third, the language of the Lease indicates that any amounts owed to the lessor under the Lease, but only any such amounts, are to be "set-off" against the lessor's obligation to refund the security deposit. Under the Lease terms, GMAC has the right to deduct, when it refunds the security deposit, *only* any amounts the lessee owes under the Lease; the balance of the security deposit will be returned to the lessee. A set-off is defined as a "debtor's right to reduce the amount of a debt by *any* sum the creditor owes the debtor". Black's Law Dictionary, 1377 (7th ed.1999) (emphasis added). Thus, the Lease in this case includes a contractual limitation on the lessor's right of set-off. The lessee essentially loans the amount of the security deposit to the lessor for the duration of the Lease, and under the terms of the Lease, the lessor's right of set-off is limited. This means that in the context of this relationship, the lessor is the debtor and the lessee is the creditor. This is inconsistent with viewing the lessor as holding a security interest in the security deposit, since security interests are held by creditors, not debtors.

Moreover, § 9–102 states that Article 9 applies to secured transactions in general, but *not* to "excluded transactions", which are enumerated in § 9–104. Section 9–104 states that Article 9 "does not apply . . . (i) to any right of set-off". Conn. Gen.Stat. § 42a–9–104(i). Therefore, *even if* a security deposit could be construed as in some sense giving rise to a transaction that would fall within the scope of Article 9, since the effect of the security deposit is to provide a right of set-off, Article 9 does not apply.

Accordingly, the court concludes that the plaintiff's complaint does not allege facts sufficient to create a claim under § 9–207(2)(c) of the UCC, and the defendant's motion to dismiss Count I should be granted.

## B. Count IICUTPA

The plaintiffs allege that GMAC "violated CUTPA with respect to plaintiffs . . . by its failure to disclose the fact that it derived a benefit or other profits from the lessees' security deposits and retained such amounts." Compl. ¶ 44.

In determining whether a particular act or practice of trade violates CUTPA, the Connecticut courts have adopted the "cigarette rule" promulgated by the Federal Trade Commission. *See Jacobs v. Healey Ford–Subaru, Inc.*, 231 Conn. 707, 725, 652 A.2d 496, 505 (1995). The Connecticut Supreme Court has held that in applying the cigarette rule to a CUTPA claim, the court must determine:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers
> . . . .
> All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Id.*, 625 A.2d at 505–6 (internal citations omitted).

As to the first prong of the rule, *i.e.* that the behavior offends public policy, the court finds that the allegations, even if proved, would not support a finding that

CUTPA was violated. The federal Consumer Leasing Act ("CLA"), 15 U.S.C. § 1667a, sets out requirements for disclosure of terms of certain leases of personal property, including automobiles. *See, e.g., Lundquist v. Sec. Pac. Auto. Fin. Serv. Corp.*, 993 F.2d 11 (2d Cir.1993). The CLA requires extensive disclosure, but it does not require any disclosure of interest or other financial benefits earned as a result of the holding of security deposits. *See Wiskup*, 953 F.Supp. at 964–65; *Lawson v. Bank One, Lexington, N.A.*, 35 F.Supp.2d 961, 966 (E.D.Ky.1997); *Gaydos v. Huntington Nat'l Bank*, 941 F.Supp. 669, 675 (N.D.Ohio 1996). Therefore, the failure to disclose financial benefits earned from the retention of security deposits does not violate public policy, at least as that policy is embodied in the CLA.

As to the second prong of the rule, *i.e.* that the behavior be "immoral, unethical, oppressive, or unscrupulous", the court finds that the allegations in the complaint do not support a finding that CUTPA has been violated. The plaintiffs allege that the defendant "violated CUTPA with respect to plaintiffs ... by its failure to disclose the fact that it derived a benefit or other profits from the lessees' security deposits and retained such amounts." Compl. ¶ 44. While it is true that the defendant could have revealed more about the possible benefits it would receive by virtue of holding the plaintiffs' deposits, the court does not conclude that its failure to do so constitutes "immoral, unethical, oppressive or unscrupulous behavior".

The fact is, any time one party is given control over money by another party for any period of time, there is a likelihood that the party in possession will be better off—in some way—as a result. Failing to disclose this rather obvious fact to the plaintiffs, and failing to pay over to them a vaguely defined and hard to quantify benefit, is not the sort of "unscrupulous" business practice that CUTPA was intended to address.

The Connecticut Appellate Court has considered the question of whether the failure to return a security deposit with interest violates the statute. In *Tarka v. Filipovic*, 45 Conn.App. 46, 694 A.2d 824, 829 (1997), the court concluded that the defendants' conduct in failing to pay interest on a security deposit "did not rise to the level of unscrupulous, oppressive, immoral or causing substantial injury and, therefore, did not constitute a violation of CUTPA." This was true even though in that case the defendants also were found to have turned off the tenant's electricity without justification and to have intentionally caused the plaintiff emotional distress by taking from her apartment and publicly releasing notes regarding her psychiatric care. *See id.* at 829.[1]

As to the third prong of the rule, *i.e.* that substantial injury to consumers has been caused, the court finds that the allegations in the complaint do not support a finding that CUTPA has been violated. In discussing the third criterion, the federal trade commission has stated: 'The independent nature of the consumer in-

---

1. Although some decisions of the Superior Court have found landlords in violation of CUTPA under similar circumstances, the reasoning in those decisions appears to hinge on two issues: the repeated nature of the defendants' conduct, and the fact that in failing to return the security deposit, the defendants were in violation of public policy as embodied in a duly enacted state statute. *See, e.g., Costin v. Collins*, No. CV 930370818, 1998 WL 166035 at *5 (Conn.Super. March 27, 1998) ("Defendant's practice in handling the security deposit of plaintiffs and, admittedly, others blatantly offended public policy as that policy is reflected" in state statute); *Littas v. Burrows*, No. CV 93092710, 1996 WL 697979 (Conn.Super., Nov. 27, 1996) ("failure to comply with the security deposit statute in multiple violations may amount to a violation of CUTPA").

jury criterion does not mean that every consumer injury is legally "unfair," however. To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.'

*A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 579 A.2d 69, 77 (1990) (internal citations omitted). Count II alleges that the defendant "violated CUTPA ... by its failure to disclose the fact that it derived a benefit or other profits from the lessees' security deposits and retained such amounts." Compl. ¶ 44. While it is arguable that one may reasonably infer from the totality of the allegations in the complaint that any injury to consumers was not outweighed by countervailing benefits to them, and that any injury to consumers was one they could not have reasonably avoided, there is no basis for a reasonable inference that any injury to consumers was substantial. The gravamen of this claim is the defendant's failure to disclose. The harm that could have been caused by non-disclosure is speculative at best, and in any event falls far short of being substantial.

Because the court finds that the plaintiff's complaint doe not allege facts sufficient to give rise to a claim under CUTPA, the defendant's motion to dismiss Count II is being granted.

## IV. *CONCLUSION*

For the foregoing reasons, the defendant's motion to dismiss Counts I and II of the Complaint is hereby GRANTED.

It is so ordered.