STATE of Minnesota, Respondent,

v.

**Robin Todd PENDLETON, Jr., Appellant.**

**No. A04–1128.**

Supreme Court of Minnesota.

Dec. 8, 2005.

Barry V. Voss, Barry V. Voss, P.A., Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, Kelly O'Neill Moller, Assistant Attorney General, St. Paul, MN, Michelle Dietrich, Redwood County Attorney, Redwood Falls, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Frank Parker was shot to death on the morning of June 9, 2002, in the yard of Morris Pendleton, Jr.'s home on the Lower Sioux Reservation in Redwood County. The shots were fired from a motor vehicle that stopped in front of the home. One of the passengers in the vehicle, Dennis Pendleton, and the driver of the vehicle, Chris Sander, were subsequently charged with aiding and abetting murder in the second degree.

■ On the first day of his jury trial Dennis Pendleton, pursuant to plea agreement, entered an *Alford* guilty plea[1] to the lesser offense of second-degree assault with a dangerous weapon and all remaining charges against him were dismissed. Less than a month later, following trial by jury, Chris Sander was acquitted of all charges.

Following Chris Sander's trial, the state obtained new and significant direct evidence identifying appellant Robin Todd Pendleton as the individual who actually fired the fatal shot that killed Parker. As a result, appellant was indicted for and subsequently found guilty of first-degree premeditated murder and first-degree premeditated murder for the benefit of a gang. The district court imposed a life sentence, and, because the crime was committed for the benefit of a gang, a consecutive sentence of a year and a day as required by Minn.Stat. § 609.229, subd. 4(a) (2004).[2]

In this direct appeal, appellant renews his pretrial claim that he was denied due process because the district court did not apply the doctrine of judicial estoppel to prevent the prosecuting attorney from asserting theories of guilt that appellant argues were inconsistent with and contrary to theories of guilt asserted by the prosecuting attorney in the earlier prosecutions of Dennis Pendleton and Chris Sander.

Appellant's second claim is that the prosecuting attorney committed prejudicial misconduct by including inadmissible hearsay in a question asked of appellant, even though the district court sustained defense counsel's objection to the question and instructed the jury to disregard it. Appellant's third claim is that the district court erred in several of its evidentiary rulings. Finally, appellant claims that the evidence, which we summarize below, was not sufficient for conviction. We affirm.

On the early morning of June 9, 2002, Frank Parker was shot to death in the yard of Morris Pendleton, Jr.'s home on the Lower Sioux Reservation in Redwood County. The shooting occurred after an all night party at the residence. Many in attendance were intoxicated. During the party, Parker had brandished a handgun when an argument occurred between his girlfriend, Kim Berry, and Danielle Grey Eagle and Raquel Eller. Eller later overheard a person at the party, whom she could not identify, phone someone, telling them "to bring their straps [guns]" "because Frankie was over there."

At approximately 7 a.m., some time after Eller overheard the phone call, a maroon Denali sports utility vehicle stopped near the front of the house. At that time Parker was standing on the porch with Marcus Pendleton, Jr. and John Merrill. Jesse Sander got out of the vehicle, told a

1. Under an *Alford* plea, a defendant may voluntarily, with knowledge and understanding, plead guilty to an offense without expressly admitting the factual basis for the plea, if the defendant reasonably believes, and the record establishes, that the state has sufficient evidence to obtain a conviction. *State v. Goulette*, 258 N.W.2d 758, 761 (Minn.1977) (citing *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)).

2. Appellant was indicted for, and subsequently found guilty by jury of premeditated first-degree murder, first-degree murder committed for the benefit of a gang, intentional second-degree murder, intentional second-degree murder for the benefit of a gang, and wrongful possession of a firearm. *See* Minn.Stat. §§ 609.185(a)(1), 609.19, subd. 1(1), 609.229, subd. 2, 624.713, subd. 1(b) (2004); *see also* Minn.Stat. § 609.05 (2004) (liability for crimes of another). The district court entered judgments of conviction for the two first-degree murder offenses and sentenced for those two convictions. Appellant, who was age 15 at the time of Parker's death, did not challenge certification for adult prosecution.

nearby group of girls to go home, and warned his cousin, Marcus, that he should go inside the house.[3] Merrill saw Chris Sander in the driver's seat of the vehicle and Dennis Pendleton seated behind the driver. Someone in the vehicle said, "Let's do this." Marcus, who had gone inside the house, watched through a window as Chris Sander got out of the vehicle and walked toward Parker. As Chris Sander approached, Marcus saw Parker start down the porch steps. According to Marcus, Parker had a handgun, but he did not notice if either Chris or Jesse Sander were carrying guns.

Marcus saw the rear passenger door of the vehicle open and someone, whom he could not identify, step out and point a rifle at Parker. Marcus also saw a second gun, a shotgun, pointed at Parker from the front passenger window. According to Merrill, appellant, who was dressed in Native Gangster Disciples' blue gang colors, stepped out of the rear passenger door of the vehicle and cocked a long gun. Merrill testified that the long gun looked like a rifle, not a shotgun; the gun was not pumped like a shotgun. Merrill retreated into the house and heard eight or more gun shots. When he left the house by a side door shortly thereafter, he found Parker lying on the ground.

Robert Fairbanks, who was in the house when he heard gunshots, also ran out of the house and saw Parker lying on the ground. At trial, Fairbanks testified that he saw people jump back into the vehicle but was not able to positively identify the individuals because he was not wearing his eyeglasses. Fairbanks testified that he had not identified appellant as the driver or the passenger from newspaper photographs he had been shown during the police investigation. Fairbanks thought that the person entering the front passenger seat was carrying a rifle, and he heard someone yell, "F**k the Native Mob" from the vehicle as it sped away.[4] Fairbanks fired at the fleeing vehicle with his .45 caliber handgun. When police found the vehicle approximately a month after the shooting, appellant's right thumb print was on the interior rear passenger window.

Parker was struck by four .223 caliber bullets, one of which entered his chest, striking both lungs and damaging his spinal cord. He bled to death from the chest wound. He was also shot in the right thigh and the left calf and had sustained a graze wound on his forearm.

According to Bureau of Criminal Apprehension (BCA) ballistics experts, the bullet casings found at the crime scene came from at least four weapons. Other evidence also indicates that there were at

---

3. Merrill and Marcus had not admitted that they were witnesses to the shooting until after Chris Sander's acquittal when Reuben Crowfeather, who was also suspected of belonging to the same gang as Parker, told the police that Merrill had additional information concerning the shooting. Merrill disclosed that Marcus was also at the party. Merrill denied that he had been coerced into coming forward to testify. Instead, he maintained that he came forward because Parker's mother had asked him to do so. Merrill also testified that he had not come forward earlier because he was concerned for the safety of his mother, who lived on the reservation.

4. There was evidence that Parker was a member of a gang identified as the Native Mob, as were Fairbanks, who was at the party and a trial witness, and Crowfeather, whom appellant asserts pressured witnesses to testify against him. Evidence was also introduced that appellant, Jesse Sander and Marcus were actual or suspected members of a rival gang, the Native Gangster Disciples. Appellant wore gang clothing during the shooting. While confined awaiting trial, appellant had prepared gang related writings. This evidence, in addition to the statement yelled at the time of the shooting, supported the state's claim that the shooting was gang-related.

least four weapons involved in the shooting incident. Fairbanks testified that he fired a .45 caliber handgun at the fleeing vehicle; investigators found five .45 caliber spent casings at the crime scene, all fired from the same gun. Parker was carrying and fired a .380 caliber handgun, which was found by his body; there were five .380 caliber spent casings found, although it could not be determined that they were fired from a single gun. A shotgun had been fired from the vehicle and five spent shotgun shells were found. And, of course, the murder weapon, which was never found, was a rifle firing .223 caliber bullets, four of which struck Parker. There were eight .223 caliber spent casings found at the crime scene.

The ballistic experts testified that the .223 caliber bullets that struck Parker could have come from a Ruger Mini 14 Rifle like the one that Dennis Pendleton's girlfriend, Katrina Swigart, had purchased in January 2002. During a search of Dennis Pendleton's home, police found an empty Ruger Mini 14 rifle box; Dennis Pendleton's fingerprints were on the gun box and on paperwork within it. During a search of Chris Sander's home, police found gun cleaning kits and a box of .223 caliber shells.

After Chris Sander's acquittal, appellant made certain admissions regarding the shooting. On August 25, 2003, appellant admitted to Grey Eagle that he was with Dennis Pendleton and Chris Sander the night of the shooting and that he did not mean to kill Parker. Appellant told Grey Eagle, "once you start you can't stop." Appellant was also overheard boasting that he was at the party where Parker was shot

and that police could not catch him. For a time, appellant evaded apprehension through the use of false names.

Appellant testified that he was not involved in the shooting and that he was with his mother in the Twin Cities when it occurred.[5] Appellant's position throughout the trial, and on appeal, was that Merrill, Grey Eagle, and other state witnesses were threatened and coerced by Crowfeather into testifying falsely. According to appellant, Crowfeather, Parker's fellow gang member, threatened appellant after Parker died and the threats became worse after Dennis Pendleton's *Alford* plea and Chris Sander's acquittal. Appellant also testified that at the time of the shooting, he had good relationships with Parker, Merrill and Fairbanks.

Following a nine-day jury trial, appellant was convicted and sentenced for first-degree premeditated murder and first-degree premeditated murder for the benefit of a gang. This appeal followed.

## I.

■ Appellant claims that he was denied due process because the district court did not apply the doctrine of judicial estoppel to prevent the prosecuting attorney from asserting theories of guilt that, according to appellant, were inconsistent with and contrary to theories of guilt asserted by the prosecuting attorney in the earlier prosecutions of Dennis Pendleton and Chris Sander. Appellant claims that the prosecuting attorney selectively used evidence to establish inconsistent factual

---

**5.** Appellant also testified that he was with his brother, Marcus Gregg, in the Twin Cities the weekend of the shooting but two witnesses later testified that Gregg was on the Reservation that weekend. Appellant explained that he was with Gregg only part of the weekend.

A police officer testified that he overheard appellant tell Autumn Jones that he was in Marshall, Minnesota the weekend of the shooting. Appellant denies making the statement.

contentions in three related prosecutions for the same crime.

 The doctrine of judicial estoppel has not been expressly recognized by this court.[6] It is intended to prevent a party from assuming inconsistent or contradictory positions during the course of a lawsuit. *State v. Larson,* 605 N.W.2d 706, 713 n. 11 (Minn.2000); *see also State v. Profit,* 591 N.W.2d 451 (Minn.1999). The doctrine "is not reducible to a pat formula," but "is intended to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992). Generally, the doctrine requires that three conditions be met. *Id.* at 264–65. First, the party presenting the allegedly inconsistent theories must have prevailed in its original position ("a litigant is not forever bound to a losing position"). *Id.* Second, there must be a clear inconsistency between the original and subsequent position of the party. *Id.* at 264. Finally, there must not be any distinct or different issues of fact in the proceedings. *Id.* The doctrine acknowledges that the state's fundamental interest in the prosecution of criminal cases is that justice be done and "[t]he [s]tate's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth." *Smith v. Groose,* 205 F.3d 1045, 1051 (8th Cir.2000). Of course, two or more defendants may play varied roles in the commission of a crime and prosecutors are not required to present the same evidence and theories in the trials of different defendants. *Id* at 1051–52. But the doctrine of

judicial estoppel dictates that the state may not, at the core of its case, rely upon factually inconsistent theories and irreconcilable evidence to obtain murder convictions in separate trials for the same murder. *See id.; see also United States v. Paul,* 217 F.3d 989, 998–99 (8th Cir.2000).

 Whether to apply the doctrine of judicial estoppel is a question of law, reviewed de novo. *See Modrow v. JP Foodservice, Inc.,* 656 N.W.2d 389, 393 (Minn. 2003). We conclude that the doctrine of judicial estoppel has no application on these facts and, thus, we decline to adopt the doctrine at this time.

First, as mentioned above, judicial estoppel requires that the party have actually previously succeeded at trial on a factual theory inconsistent to the one in question. Here, that was not the case. The prosecution of Chris Sander was not successful as he was acquitted of all charges, which is certainly not inconsistent with appellant's conviction. The prosecution of Dennis Pendleton ended on the first day of trial when he was permitted to enter an *Alford* guilty plea to the lesser offense of second-degree assault with a dangerous weapon in violation of Minn.Stat. § 609.222, subd. 1 (2004).[7] Second-degree assault may consist of causing fear of great bodily harm or death in another through use of a dangerous weapon—in this case, firing a gun at the victim but not necessarily hitting him. Dennis Pendleton's plea of guilty to this charge is not in conflict with the theory nor irreconcilable with the evidence that two individuals fired two weapons from the vehicle, the bullets from one, a rifle, striking and killing the victim and the bullets

6. In the recent case of *Bradshaw v. Stumpf,* the Supreme Court also declined to expressly adopt (or reject) the doctrine of judicial estoppel. *See Bradshaw v. Stumpf,* —— U.S. ——, ——, 125 S.Ct. 2398, 2408, 162 L.Ed.2d 143 (2005).

7. "Whoever assaults another with a dangerous weapon may be sentenced to imprisonment for not more than seven years or to payment of a fine of not more than $14,000, or both." Minn.Stat. § 609.222, subd. 1.

from the second weapon, a shotgun, missing the victim. There is therefore nothing inconsistent between the second-degree assault conviction and appellant's first-degree murder conviction.

Second, there is not even a conflict between the charges as initially filed by the state against the various defendants. Appellant was charged with first-degree premeditated murder, the prosecutor asserting that appellant actually fired the fatal shot. In the earlier prosecutions, the prosecutor alleged that Dennis Pendleton and Chris Sander aided and abetted intentional murder in the second degree in the killing of Parker. We conclude that the prosecutor did not rely upon factually inconsistent theories or irreconcilable evidence in its prosecution of the three cases arising out of Parker's murder and the results in each of the cases are not theoretically inconsistent nor based upon irreconcilable evidence.

Finally, the application of judicial estoppel is uncertain where a party changes its position after the previous proceedings due to the discovery of new evidence. As we stated in *State v. Profit,* the doctrine is aimed at preventing bad faith abuses of the judicial system wherein a party asserts one theory to prevail at one time, then cynically switches to an inconsistent theory to win in a subsequent proceeding. *See Profit,* 591 N.W.2d at 462. However, parties who change their theories after they discover new evidence bearing on the issue are not acting in bad faith. *See id.* Such changes are consistent with the court's truthfinding role.

Here, following the aborted prosecution of Dennis Pendleton and the unsuccessful prosecution of Chris Sander, new and significant direct evidence came to light identifying appellant as the individual who actually fired the fatal shot that killed Parker. In the prosecution of Dennis Pendleton, it is apparent from examining the probable cause portion of the complaint, the transcripts of the prosecutor's opening statement, and the *Alford* plea hearing, which almost immediately followed, that the prosecutor had not been able to specifically identify the passenger who fired the rifle shots that killed Parker. The prosecutor was instead relying upon circumstantial evidence that implicated Dennis Pendleton as one of the shooters because he was a passenger in the vehicle from which the shots were fired.[8] It was only after Dennis Pendleton's plea of guilty and after Chris Sander's trial that the prosecutor learned that, first, Merrill had identified appellant as the individual in the vehicle with the probable murder weapon, and second, appellant had made incriminating admissions regarding the shooting.

Similarly, in the trial of Chris Sander the prosecutor argued unsuccessfully that Chris Sander (who was in the vehicle from which the fatal shots were fired) should be convicted of aiding and abetting second-degree murder for the benefit of a gang. New and significant direct evidence discovered after Chris Sander was acquitted indicated that Chris Sander had walked away from the vehicle before the shots were fired and that appellant actually fired the fatal shot from the vehicle. We conclude that the prosecutor's position in ap-

8. Some of the circumstantial evidence the state planned to use was mentioned in the opening statement. Witnesses allegedly saw *someone* get in the front passenger seat with a rifle as the car sped away, who yelled "F**k the Native Mob"; a box for ammunition of the type that killed Parker was found at Dennis Pendleton's girlfriend's home; a rifle purchased by Dennis Pendleton's girlfriend used the type of ammunition that killed Parker; and this rifle was never found.

pellant's case was neither inconsistent with nor contrary to her position in the aborted prosecution of Dennis Pendleton nor in the unsuccessful prosecution of Chris Sander.

## II.

■ Appellant's second claim is that the prosecutor committed prejudicial misconduct during her cross-examination of appellant by referring in a question to an out-of-court statement by Chris Sander, who did not testify. The question, contextually in response to appellant's direct testimony that he was not at the scene of the shooting, was: "if you were not with Chris Sander and Dennis Pendleton, why would Chris Sander in a recorded conversation at the jail say that you were [there]?" Defense counsel objected to the question before appellant could answer and the district court sustained the objection and instructed the jury to disregard the question. Again at the conclusion of the trial, the district court instructed the jury to disregard all evidence the court had instructed the jury to disregard.

Appellant argues that merely posing the question placed him in an untenable position because he could not explain why Chris Sander made such a statement and the question assumed the truth of Chris Sander's statement. Appellant asserts that the question was improper, and that even though his objection was sustained, the error was not harmless.

■ We conclude that the question was indeed improper. It impermissibly interjected the inadmissible hearsay statement Chris Sander made at the jail into the trial. It is not "artful cross-examination" to inform the jury of inadmissible evidence by the question asked. *See United States v. Sanchez*, 176 F.3d 1214, 1222 (9th Cir. 1999). In its brief to this court the state does not suggest otherwise. The question is whether, under the circumstances, ap-

pellant is entitled to a new trial. We reverse because of prosecutorial misconduct only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial. *State v. Roman Nose*, 667 N.W.2d 386, 401 (Minn.2003).

■ Prosecutorial error may be cured by the court's instructions. *See State v. Race*, 383 N.W.2d 656, 664 (Minn. 1986). But if remarks impart substantial prejudicial evidence into the case, it may not be proper to say its effect can be removed by an instruction from the court. *See State v. Caldwell*, 322 N.W.2d 574, 590–91 (Minn.1982). Improper prosecutorial statements are examined under a harmless error test. *See State v. Washington*, 521 N.W.2d 35, 39–40 (Minn.1994).

Appellant relies on *United States v. Sanchez* in arguing that the error in this case was prejudicial. In *United States v. Sanchez*, extrajudicial statements by the defendant's wife were wrongly admitted over objection during cross-examination of the defendant. *Sanchez*, 176 F.3d at 1221–22.

■ However, unlike *Sanchez*, the district court in this case sustained the objection to the problematic question, did not allow it to be answered, and instructed the jury to disregard it. The district court also provided final instructions which would further cure any misconduct. It is presumed that the jury follows the court's instructions. *State v. Taylor*, 650 N.W.2d 190, 207 (Minn.2002). We conclude that while asking the question was improper, the court's ruling and instructions adequately addressed the misconduct, and the improper question did not impair appellant's right to a fair trial.

## III.

■ Appellant's third claim is that the district court abused its discretion by

three evidentiary rulings that excluded defense evidence. Every criminal defendant has a right to fundamental fairness and to be "afforded a meaningful opportunity to present a complete defense." *State v. Richards,* 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). This right includes the opportunity to "present the defendant's version of the facts * * * so [the jury] may decide where the truth lies." *Id.* at 194 (quoting *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

However, a defendant must still comply with the rules of evidence when presenting his or her defense. *State v. Reese,* 692 N.W.2d 736, 740 (Minn.2005). The district court may exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Minn. R. Evid. 403. Evidentiary rulings of the district court will not be overturned absent a clear abuse of discretion, even when constitutional rights are implicated. *See Profit,* 591 N.W.2d at 463; *State v. Kelly,* 435 N.W.2d 807, 813 (Minn.1989). The appellant must prove that the district court abused its discretion and that the abuse of discretion prejudiced the appellant. *State v. Moua,* 678 N.W.2d 29, 37 (Minn.2004).

The first evidentiary ruling that appellant complains of relates to certain newspaper photographs of Chris Sander and Dennis Pendleton that had been shown to Fairbanks by the police during their investigation. According to appellant's counsel, Fairbanks had indicated that Chris Sander looked like the driver of the vehicle and had indicated that Dennis Pendleton looked like the front seat passenger with a long gun who had yelled "f\*\*k the Native Mob." Appellant claims that admission of these photographic identifications might have persuaded the jury that Chris Sander and Dennis Pendleton were the actual murderers.

The district court's pretrial ruling in the Dennis Pendleton case was that the photographs were unduly suggestive and the identification resulting from the photographs inadmissible. In this case, appellant's counsel in opening statement referred to Fairbanks's previous identification of Dennis Pendleton from the newspaper photographs. On cross-examination, appellant's counsel began to ask Fairbanks about his previous identification based on the photographs. The district court sustained the state's objection, noting that the identification was fundamentally flawed, but did permit appellant's counsel to elicit testimony that Fairbanks had been shown photographs by authorities and that he had not identified appellant from those photographs as either a driver or passenger in the vehicle. In closing argument appellant's counsel reiterated that Fairbanks had been shown photographs and had not identified appellant as the person getting in the right front seat of the vehicle. We conclude that it was not an abuse of discretion under the circumstances for the district court to sustain objection to "fundamentally flawed" identifications from newspaper photographs earlier ruled to be unduly suggestive and inadmissible, but to permit the witness to testify that he had not identified appellant from the photographs.

The second evidentiary ruling that appellant complains of is the exclusion of evidence that the second-degree murder charges against Dennis Pendleton were dismissed as part of a plea agreement. Appellant contends that after the murder charges were dismissed against Dennis

Pendleton and he was permitted to plead guilty to second-degree assault, members of Parker's gang (angry about the dismissal of the murder charges) coerced and threatened witnesses to induce them to testify falsely against appellant. Appellant argues that evidence of Dennis Pendleton's plea agreement and Chris Sander's subsequent acquittal would have confirmed that rival gang members were increasingly seeking retribution against appellant. The jury was informed of Chris Sander's acquittal. The district court instructed the jury during trial that "Dennis Pendleton was convicted of a charge arising out of these events. However, you are not to concern yourself with what action, if any, was taken against any other person in this case." In its final instruction the district court instructed the jury that they were not to concern themselves with what action, if any, was taken against others who may have been involved. Appellant made two references to the dismissal of murder charges against Dennis Pendleton in closing argument. We conclude that the district court did not abuse its discretion by its ruling excluding evidence of the plea agreement in the Dennis Pendleton case.

■ We also conclude that the district court did not abuse its discretion with regard to the third evidentiary ruling complained of, excluding, as cumulative, testimony from Grey Eagle's mother that Grey Eagle had been threatened and intimidated by Crowfeather before testifying before the grand jury. Grey Eagle testified that she was told by Crowfeather before she testified before the grand jury that she should be "scared" if she did not testify that appellant was at the shooting. The testimony of Grey Eagle's mother was merely cumulative, and the district court was within its discretion to exclude it.

## IV.

■ To address appellant's final claim that the evidence was insufficient for conviction, we must make a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in the light most favorable to the verdict, were sufficient to allow the jury to reach its verdict. *State v. Asfeld*, 662 N.W.2d 534, 544 (Minn.2003); *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989).

The evidence, considered in the light most favorable to the verdict, indicates that the shooting was premeditated; it was planned and deliberately carried out. Firing four shots from a rifle at another indicates that the killing was intentional. Merrill saw appellant, dressed in gang clothing, step out of the rear passenger door of the vehicle with a long gun that appeared to be a rifle. Appellant also admitted to others that he was present at the shooting and that he had not meant to kill Parker. Appellant was a member of the Native Gangster Disciples, a gang rival to the Native Mob gang to which decedent Parker belonged. There was ample evidence the crime was committed for the benefit of a gang.

Appellant argues that we should consider witness credibility in our review of the record to determine if there was sufficient evidence for conviction. We acknowledge, as appellant asserts, that the credibility of the state's witnesses was a significant concern in these cases. Many witnesses were intoxicated when the shooting occurred. Gang involvement could have motivated some witnesses to testify falsely or made others reluctant to testify. Some witnesses may have been threatened or coerced into testifying by the gangs involved in the case. Given the general confusion, conflicting statements, and biases of the witnesses, there were certainly

grounds for the jury to doubt the credibility of the trial witnesses.

The evidence regarding credibility, however, was presented and argued to the jury, and it is for the jury, not this court, to determine the credibility and weight to be given to the testimony of witnesses. *State v. Olhausen,* 681 N.W.2d 21, 26 (Minn.2004). We assume that the jury believed the witnesses whose testimony supports the verdict and that the jury did not believe evidence to the contradictory. *State v. Voorhees,* 596 N.W.2d 241, 252 (Minn.1999); *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). The jury properly decides which evidence is credible. *State v. Pippitt,* 645 N.W.2d 87, 92 (Minn.2002). Even where witness credibility has been challenged, the jury may nonetheless believe the witness. *See id.* at 94.

From our review of the record we are satisfied that the jury was presented with sufficient evidence to assess the credibility of the witnesses. It is up to the jury to decide the issues of fact, and they have done so. We conclude that the evidence was sufficient for conviction.

Affirmed.